IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**RACHEL HIGGINS, as Guardian
ad Litem for B.P., a minor child,**

    Plaintiff,

v.                                                              No. 17-CV-234 WPL/LF

**BRITTNY SAAVEDRA, in her personal
capacity acting under color of state law;
DEBORAH GARTMAN, in her personal
capacity acting under color of state law;
MARK A. GARCIA, in his personal
capacity acting under color of state law;
SHONN SCHROER, in his personal
capacity acting under color of state law;
CYNTHIA SOO HOO, in her personal
capacity acting under color of state law;
and ALBUQUERQUE PUBLIC
SCHOOLS DISTRICT,**

    Defendants.

**MEMORANDUM OPINION AND ORDER**

In the First Amended Complaint for Civil Rights Violations (Doc. 40) (Complaint), Plaintiff Rachel Higgins (Plaintiff) asserts claims as Guardian ad Litem on behalf of B.P., a minor child who was a student at West Mesa High School (WMHS) in the Albuquerque Public Schools District (APS). Compl. ¶¶ 1, 4, 13. Defendants are APS, Cynthia Soo Hoo, the Executive Director of Compliance for the Special Education Department at APS (ED Soo Hoo), Brittny Saavedra, the Head Varsity Cheerleading Coach at WMHS (Coach Saavedra), Deborah Gartman, the Assistant Principal at WMHS (Asst. Principal Gartman), Mark A. Garcia, the Principal at WMHS (Principal Garcia), and Shonn Schroer, the Athletic Director at WMHS (Athletic Director Schroer) (together, Defendants). Compl. ¶¶ 3–9.

Plaintiff alleges that B.P., who was a member of the WMHS varsity cheerleading squad, was sexually harassed and intimidated by other members of the team while on a school-sponsored trip and at WMHS. Compl. ¶¶ 14, 43, 126. Plaintiff asserts that Defendants violated B.P.'s rights when they failed to respond reasonably and instead contributed to the harassment and intimidation, retaliated against B.P., and attempted to extort a release from liability by withholding B.P.'s transfer to another school. Compl. ¶¶ 128–131, 146–147, 152. Plaintiff brings claims under Title IX as to APS and 42 U.S.C. §§ 1983 and 1985 as to all Defendants. Defendants have moved to dismiss Plaintiff's § 1985 claim on the pleadings. Finding that Plaintiff has failed to allege all elements required under § 1985, I conclude that dismissal of the § 1985 claim is required and grant the Motion.

I.     BACKGROUND

The following facts are drawn from the Complaint. In July of 2015, B.P. traveled to Phoenix, Arizona with the other members of the WMHS varsity cheerleading squad to participate in a three-day cheerleading camp as arranged by Coach Saavedra. Compl. ¶¶ 14, 16. Coach Saavedra was one of three chaperones traveling with the team; the other two were Chloe Saavedra and Salome Chavez. *Id.* Although chaperones for APS school-sponsored events were required to be 21 years of age or older, Ms. Chavez was just 17 years old at the time and had graduated from WMHS only two months before. Compl. ¶¶ 15–18. B.P.'s parents authorized B.P. to attend the camp on the condition that B.P., then 15 years old, would stay in the same hotel room as Coach Saavedra. Compl. ¶ 19. Coach Saavedra initially agreed to this arrangement, but after Coach Saavedra's boyfriend arrived at the hotel she moved B.P. so that Coach Saavedra and her boyfriend could be alone in the room. Compl. ¶¶ 19–21. Coach

Saavedra placed B.P. in a hotel room with Ms. Chavez and two other members of the cheerleading squad. Compl. ¶ 21.

On the evening of July 25, 2015, B.P. was showering in the hotel room when the two teammates who shared her room, and possibly other members of the cheerleading squad as well, used Ms. Chavez's cell phone to photograph and videotape B.P. in the shower. Compl. ¶¶ 21–23. At least two cheerleaders put the phone over the shower to photograph B.P. and then pulled the curtain away from B.P. to take video while she was naked and scared. Compl. ¶ 22. The video was posted on the social media app "Snapchat" and shown to approximately seven of B.P.'s other teammates, who began to tease and harass B.P. by making derogatory comments about her body. Compl. ¶¶ 24–25. These included explicit references of a sexual nature, and derided B.P. for not conforming to her teammates' stereotypes of attractive femininity. Compl. ¶¶ 24, 47.

That same night, B.P. went to Coach Saavedra's hotel room and reported the incident. Compl. ¶ 29. Coach Saavedra told B.P. to apologize to her teammates for overreacting to a joke. Compl. ¶ 30. Coach Saavedra stated that none of B.P.'s teammates would be disciplined because Coach Saavedra did not want to "ruin the trip for everybody," and she threatened to punish B.P. by making B.P. run during practice if B.P. ruined the trip for the other WMHS cheerleaders. Compl. ¶¶ 31–32. Coach Saavedra told B.P. in front of her teammates that the other cheerleaders had only been playing a joke on B.P., that this was just what girls did during sleepovers, and that B.P. was overreacting. Compl. ¶ 35.

B.P. attempted to speak to hotel security, but Coach Saavedra and Assistant Coach Chloe Saavedra saw her, became upset, and prevented B.P. from reporting what had happened and security from assisting B.P. further. Compl. ¶ 36. B.P. notified her parents of the incident, but when Coach Saavedra spoke to B.P.'s mother the next day she requested that B.P.'s mother not

contact the Phoenix Police because Coach Saavedra did not want B.P.'s teammates to get in trouble for a "prank." Compl. ¶¶ 34, 37. In speaking to B.P. the night of the incident and to B.P.'s mother the next day, Coach Saavedra characterized the events as "no big deal" because one of the cheerleaders involved had previously taken photos and videos of another teammate using the toilet and that person had not complained. Compl. ¶¶ 33–34.

Contrary to Coach Saavedra's request, B.P.'s mother did contact the Phoenix Police Department. Compl. ¶ 38. But Coach Saavedra refused to cooperate with the police investigation. Compl. ¶ 39. She prevented witnesses from speaking to the police, told the police there was no video, and failed to return phone calls from the Phoenix Police Department detective. *Id.* The day after the incident, B.P. was excluded from a photo of the WMHS varsity cheerleading squad that was posted on social media. Compl. ¶ 40. Coach Saavedra was overheard that day making negative comments about B.P. to the other coaches and cheerleaders. Compl. ¶ 41. She called B.P. "a baby" and a bad teammate for reporting the incident to hotel security and police, and she said that incidents like that were part of competing and B.P. should "get over it and stop complaining" because the video had been deleted. *Id.* On the way back to Albuquerque, Coach Saavedra and Chloe Saavedra sat near B.P. on the plane and called her "a baby" who was "overreacting" and needed to "get over it." Compl. ¶ 42.

But there had been two copies made of the video, and the harassment and intimidation continued after B.P. returned to WMHS. Compl. ¶¶ 43–44, 47, 54, 69. B.P.'s teammates laughed at her and told other WMHS students about the incident, who then also teased her. Compl. ¶ 61. Coach Saavedra demoted B.P. from her position as "flier" on the varsity cheerleading squad, blamed B.P. in front of the entire team for a two-week suspension of practice, and excluded B.P. from team activities. Compl. ¶ 44. Despite her love of cheerleading and her previous intent to

remain a member of the team all four years of high school, B.P. quit the cheerleading squad because of the taunting and ostracization. Compl. ¶¶ 65–66. However, it still did not stop. Compl. ¶ 69. One former teammate who had been involved in the July 25 incident and that teammate's mother followed B.P. around campus one day. *Id.* Even B.P.'s younger brother and one of B.P.'s friends, who were also WMHS students, experienced harassment and intimidation. Compl. ¶¶ 71–75. Other members of the cheerleading squad, including B.P.'s friend, also quit the team due to the ongoing harassment and the lack of response by WMHS administrators and staff. Compl. ¶ 67.

B.P.'s parents requested the WMHS administration to take disciplinary action against the teammates involved, explained that they had entrusted the cheerleading coaches with the care of their daughter, and expressed concern that the incident was being trivialized and that B.P. was afraid and was being shunned for having reported the incident. Compl. ¶¶ 44–46. Members of the WMHS administration interviewed the WMHS cheerleaders on August 4 and 5, 2015, and were told that one teammate had taken photos of B.P. nude in the shower and another had taken video, which was stored to two different files and shown to the entire cheerleading squad, at least some of whom then made derogatory comments of a sexual nature about B.P.'s body. Compl. ¶ 47.

Defendants were authorized to take disciplinary action regarding off-campus misconduct during school activities, and Principal Garcia had the discretion to remove students from extra-curricular activities if their conduct did not meet standards higher than those expected during classroom hours. Compl. ¶¶ 62–63. However, at an August 14, 2015, meeting attended by B.P. and her parents, Asst. Principal Gartman, Athletic Director Schroer, and APS Officer Deb Romero, B.P. was told that only one of her teammates would be disciplined, and that the

5

punishment would not include removal from the WMHS varsity cheerleading squad. Compl. ¶ 45. Toby Herrera, the Director of the Student Service Center, suggested that all students involved be removed from the team for the year, but this suggestion was rejected. Compl. ¶ 59. No consequences were imposed on the other participating cheerleaders despite WMHS policies acknowledging the necessity of discipline in fulfilling the educational function of the school. Compl. ¶¶ 48–50, 60. The student who had taken the nude photographs of B.P. was not disciplined, despite the fact that she had previously taken photographs and video of another WMHS cheerleader who was on the toilet, Coach Saavedra was aware of the previous incident, and APS was or should have been aware of both the incident and Coach Saavedra's failure to discipline the student at that time. Compl. ¶¶ 49, 51–53. APS did not take any disciplinary action against Coach Saavedra either. Compl. ¶ 53.

Defendants were aware that the harassment continued after this meeting, yet they continued to minimize the problem and instead retaliated against B.P. Compl. ¶¶ 54–58, 61, 68–70, 74, 77. Despite further requests from B.P.'s parents and concerns voiced by other parents, Defendants did not reasonably intervene even though they had acknowledged that B.P. was being harassed, intimidated, and bullied. Compl. ¶¶ 54–58, 61, 66, 68–70, 74. Defendants repeatedly requested that B.P. engage in mediation with her tormentors, even though APS policy states that mediation is not appropriate if bullying is involved. Compl. ¶¶ 58, 69. Athletic Director Schroer told parents that this was to be expected in cheerleading and refused to let B.P. talk about the July 25 incident with her former WMHS advisor. Compl. ¶¶ 68, 77. Principal Garcia warned one of B.P.'s male friends that B.P. was "drama." Compl. ¶ 77.

As a result of the continuous harassment, B.P., her younger brother, and her friend all attempted to transfer out of WMHS. Compl. ¶¶ 75, 83, 85. B.P.'s mother submitted a transfer

request for both B.P. and her brother on October 7, 2015, citing safety concerns. Compl. ¶ 85. APS delayed the transfer with no reasonable basis for the delay and despite having actual knowledge that WMHS was an unsafe environment. Compl. ¶¶ 86–87. In December 2015, WMHS administrators informed the principal of the proposed transfer school that "he would have nothing but drama" if he accepted B.P. into his school. Compl. ¶ 77. On January 4–5, 2016, Principal Garcia discussed B.P.'s requested transfer with WMHS official Rae Lynn Dooley. Compl. ¶ 88. On January 7, 2016, B.P.'s mother spoke to the principal of the proposed transfer school and he signed transfer documents agreeing that B.P. could start classes there immediately. Compl. ¶ 89. B.P.'s mother then went to WMHS to withdraw B.P. and her younger brother. Compl. ¶ 90. But later that day, B.P.'s mother received voicemail and email messages from ED Soo Hoo stating that B.P.'s transfer could not be completed until B.P. and her parents released all APS entities, agents, and employees from liability on any civil claims by B.P. or her parents. Compl. ¶¶ 91, 98, 107.

APS and its agents, employees, and representatives knew that B.P. and her parents were represented by counsel, planned to file civil tort claims against APS, and wished to have all communication with WMHS or APS officials handled through their attorney. Compl. ¶¶ 100–103. Nevertheless, ED Soo Hoo contacted B.P.'s mother directly and attempted to obtain a release from liability in exchange for B.P.'s transfer by saying that there had been an administrative error regarding the approval of B.P.'s transfer and that the process for approving a transfer was through the settlement agreement, which was attached to the email. Compl. ¶¶ 94, 99, 104, 107. ED Soo Hoo discussed this plan over email with Lucinda Sanchez, the Interim Associate Superintendent with the Special Education Department at APS, stating that "we have a settlement agreement completed . . . Should they agree . . . she will be moved to [the transfer

school]." Compl. ¶ 106. ED Soo Hoo stated to B.P.'s parents that APS could "make B.P.'s transfer happen" if they dropped B.P.'s civil claims. Compl. ¶ 105. However, official APS policy does not require a release of claims before a student is allowed to transfer, and B.P.'s brother and B.P.'s friend were both allowed to transfer out of WMHS without being asked to waive their rights to bring legal claims. Compl. ¶¶ 93, 95, 97.

On January 8, 2016, the day after she received the messages from ED Soo Hoo, B.P.'s mother went to the transfer school to begin the enrollment process for B.P. and B.P.'s younger brother. Compl. ¶ 108. But ED Soo Hoo, on behalf of APS, had instructed the principal at the transfer school not to accept B.P. unless her parents waived their legal claims. Compl. ¶ 113. The principal informed B.P.'s mother that APS had told him to reverse B.P.'s transfer pending further instruction from APS administration, although he had previously approved the transfer and there was no impediment at the transfer school to B.P.'s enrollment there. Compl. ¶¶ 89, 109–110. B.P.'s younger brother was allowed to transfer immediately, but B.P.'s transfer was refused despite both requests having been submitted on the same day and both having cited safety reasons. Compl. ¶ 114–115. It was not until after B.P.'s attorney filed a temporary restraining order on B.P.'s behalf that APS changed its course of action. Compl. ¶¶ 116–117.

On January 10, 2016, ED Soo Hoo emailed Interim Associate Superintendent Lucinda Sanchez and the principal at the transfer school letting them know that B.P. would start there the next day. Compl. ¶ 118. Ms. Sanchez responded by inquiring whether B.P.'s parents had signed the release, and ED Soo Hoo replied the next day, saying that they had not signed, but because of the temporary restraining order, "[w]e decided to go ahead and approve it." Compl. ¶ 120. APS finally allowed B.P. to transfer schools on January 11, 2016, over three months after her initial request had been submitted. Compl. ¶¶ 85, 117.

8

Based on these events, Plaintiff filed claims on B.P.'s behalf alleging that APS discriminated against B.P. on the basis of her sex in violation of Title IX, and that all Defendants violated B.P.'s rights under the First Amendment and the Equal Protection Clause and conspired to interfere with her civil rights contrary to 42 U.S.C. § 1985. In the Motion to Dismiss, Defendants argue that Plaintiff has failed to state a claim under § 1985 and that Defendants are entitled to qualified immunity.

## II. DISCUSSION

"A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). The Court will "accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff." *Ramirez v. Dep't of Corr., Colo.*, 222 F.3d 1238, 1240 (10th Cir. 2000). Dismissal on the pleadings is generally appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would [warrant] relief." *Ramirez*, 222 F.3d at 1240 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). But "[t]o overcome a defendant's claim of qualified immunity in the context of a Rule 12(c) motion, a plaintiff's pleadings must establish both that the defendant's actions violated a federal constitutional or statutory right and that the right violated was clearly established at the time of the defendant's actions." *Id.*

### A. Plaintiff's Section 1985 Claim

Section 1985 provides a cause of action based on allegations of conspiracy to 1) prevent a federal officer from performing official duties; 2) obstruct justice or intimidate a party, witness, or juror; or 3) deprive a person of equal protection and privilege under the law. Plaintiff alleges that Defendants and other WMHS and APS administrators, specifically including Lucinda

9

Sanchez, acted under color of law to interfere with B.P.'s civil rights by conspiring to deprive B.P. of a free and appropriate public education in a safe environment by refusing her transfer unless her parents waived B.P.'s right to access the civil justice system. Plaintiff asserts that Defendants and other administrators impeded B.P.'s civil rights claims by their actions, and that they did so with the intent to deny B.P. equal protection of the law, in retaliation against B.P. for her exercise of her First Amendment right to administratively report the harassment she faced and to petition the courts for redress. *See* Compl. ¶¶ 174–185. Defendants argue that even accepting the truth of Plaintiff's allegations, Plaintiff fails to state a claim under § 1985 because the acts alleged are not of the type that § 1985 was intended to prohibit. Mot. at 7.

Although Plaintiff does not specify the subsection of § 1985 referenced in the Complaint, the Court agrees with Defendants that § 1985(1) is inapplicable to B.P.'s claim because the plain language of that subsection refers only to conspiracy against federal officers. *See* Mot. at 9. The remaining two statutory provisions contain similar language potentially relevant to Plaintiff's claim. Section 1985(2), in relevant part, provides a cause of action "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws." And § 1985(3) applies similarly when "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws[.]" Defendants contend that Plaintiff has not stated a claim under either § 1985(2) or (3) because both of those provisions apply only when the conspiracy is motivated by racial or other class-based animus, and Plaintiff has not alleged that Defendants conspired against B.P. because of her membership in any protected class. Mot. at 20.

Section 1985 is a Reconstruction-era civil rights statute for "the prevention of deprivations which shall attack the equality of rights of American citizens." *Griffin v. Breckenridge*, 403 U.S. 88, 100 (1971). But so that its broad language does not expand into a "general federal tort law[,]" the Supreme Court has required, "as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors[.]" *Id.* at 102. "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* The Supreme Court in *Griffin* expressly declined to decide whether § 1985(3) could reach claims of conspiracy motivated by a discriminatory intent other than racial bias. *Id.* at 102 n.9. It has since noted that this is a close question, because "[t]he predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983). While the Supreme Court has not repudiated the possibility it left open in *Griffin*, it has continued to narrowly construe § 1985(3). *See id.* at 837 (economic or commercial bias is not class-based animus for the purposes of § 1985(3)); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (women seeking abortions are not a class under § 1985(3)).

These limitations apply equally to claims brought under the equal protection provision of § 1985(2). *Smith v. Yellow Freight Sys., Inc.*, 536 F.2d 1320, 1323 (10th Cir.1976). "[B]oth causes of action require a showing of 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Jones v. Norton*, 809 F.3d 564, 578 (10th Cir. 2015) (quoting *Griffin*, 403 U.S. at 102). "The focus of the . . . animus inquiry is the government actor's intent, motive, or purpose." *Id.* (internal quotation marks omitted). "To avoid

summary judgment, Plaintiff[] must point to specific, nonconclusory evidence that the Defendants'' actions were improperly motivated." *Id.* (internal quotation marks omitted). "In the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." *Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994) (internal brackets and quotation marks omitted).

Plaintiff alleges that the § 1985 conspiracy claim "stems from . . . targeted retaliation and discrimination against B.P. for her attempt to enforce her First Amendment right to report sexual harassment[.]" Resp. at 1. Defendants' alleged motivation was a desire to intimidate B.P. into waiving her legal claims. Resp. at 3. But Plaintiff does not make any allegations that this desire was founded in racial or other class-based discriminatory animus. Plaintiff quotes *Lessman v. McCormick*, 591 F.2d 605, 608 (10th Cir. 1979), for the proposition that "cases which have recognized under § 1985, classes which are not racially based, have stayed close to the areas protected by the First Amendment." Resp. at 11. Plaintiff appears to contend that the § 1985 claim is actionable because the rights of which Defendants allegedly conspired to deprive B.P. were grounded in the First Amendment. This argument is misplaced. Regardless of the origins of the right deprived, the conspirators must have been motivated by class-based animus. *See Scott*, 463 U.S. at 833–34 (§ 1985 claim based on deprivation of First Amendment right to association requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.").

While Plaintiff acknowledges the requirement for class-based animus under § 1985(2) and (3), she contends that this element is adequately alleged because Defendants conspired against B.P. based on her attempted exercise of her First Amendment rights, thereby denying her

equal protection as a class of one. *See* Resp. at 15–19. But for the purposes of § 1985, the class cannot be defined only by Defendants' alleged interference.

> Whatever may be the precise meaning of a "class" for purposes of *Griffin*'s speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid. As Justice BLACKMUN has cogently put it, the class "cannot be defined simply as the group of victims of the tortious action."

*Bray*, 506 U.S. at 269 (internal citations omitted); *see also Royal Oak Entm't, LLC v. City of Royal Oak, Mich.*, 205 F. App'x 389, 399 (6th Cir. 2006) (rejecting the premise that a "class of one" equal protection theory can support a claim under § 1985); *C & H Co. v. Richardson*, 78 F. App'x 894, 901–02 (4th Cir. 2003) (same); *Burns v. State Police Ass'n of Mass.*, 230 F.3d 8, 12 n.4 (1st Cir. 2000) (suggesting that § 1985 does not extend to class-of-one claims). I therefore conclude that Plaintiff has failed to allege any class-based discriminatory animus as the motivation for Defendants' actions, so has failed to state a claim under § 1985. Accordingly, it is unnecessary for me to consider Defendants' claim of qualified immunity.

IT IS THEREFORE ORDERED that Defendants' motion to dismiss Plaintiff's Section 1985 conspiracy claims for failure to state a claim (Doc. 43) is GRANTED and those claims are dismissed.

_____
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.