**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

RACHEL HIGGINS, as
Guardian Ad Litem for B.P.,
a minor child,

       Plaintiff,

v.                                    No. CIV 17-0234 RB/LF

BRITTNY SAAVEDRA, in her personal capacity
acting under color of state law; DEBORAH GARTMAN,
in her personal capacity acting under color of state law;
MARK A. GARCIA, in his personal capacity acting under
color of state law; SHONN SCHROER, in his personal
capacity acting under color of state law; CYNTHIA
SOO HOO, in her personal capacity acting under color of
state law; and ALBUQUERQUE PUBLIC SCHOOL DISTRICT,

       Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Title IX Claim for Failure to State a Claim, filed on June 27, 2017. (Doc. 64.) Jurisdiction arises under 28 U.S.C. § 1331.

One evening during a three-day cheerleading camp, two teenage girls went into the bathroom where their teammate, B.P., was in the shower. One of the girls put a phone over the shower curtain and took pictures of B.P. The second girl then pulled the shower curtain away and videotaped B.P., who was naked, scared, and defenseless. Not satisfied, the girls then made the contemptible decision to post the video of B.P. on a social media app and show it to other teammates staying at the hotel.

Mortified, B.P. went to her cheerleading coach for help. Rather than help the child and discipline the perpetrators of a crime, the coach turned on B.P. The coach prevented B.P. from

telling hotel security, refused to cooperate with the eventual police investigation, forced B.P. to apologize to the entire squad for ruining the weekend, ostracized her from squad activities, and ultimately demoted her from her squad position. Emboldened by the tacit approval from their authority figure, B.P.'s now former teammates continued to harass her at school to the point that B.P. did not feel safe and sought transfer to a new high school. School officials, smelling a lawsuit, tried to obstruct B.P.'s exit: they told her parents that the transfer would not go through until the family signed documents releasing the school from all civil claims. The school's ruse was unsuccessful, as B.P. is now at her transfer school and the Court is presiding over her claims under Title IX, the First Amendment, the Equal Protection Clause, and 42 U.S.C. § 1985.

In their Motion to Dismiss Plaintiff's Title IX Claim for Failure to State a Claim, the Defendants argue that "Plaintiff's Title IX claim is premised on acts by Defendants that simply are not driven by B.P.'s sex, the defining element of a Title IX claim." (Doc. 64 at 2.) The Court agrees that Plaintiff did not plead allegations sufficient to maintain her Title IX claim for gender-based harassment; however, Plaintiff has stated a plausible claim for retaliation under Title IX. Accordingly, the Court will grant the motion in part.

## I.    Background[1]

### The July 25, 2015 incident

B.P., a minor child and former student at West Mesa High School (WMHS), was a member of the WMHS Varsity Cheerleading Squad (the "Squad"). (Am. Compl. ¶¶ 2, 13.) WMHS "is a public high school within the [Albuquerque Public School (APS)] District." (*Id.* ¶ 4.)

---

[1] The Court recites the facts, as it must, in a light most favorable to Plaintiff as they are found in her Amended Complaint.

In July 2015, the Squad traveled to Phoenix, Arizona to participate in a three-day cheerleading camp. (*Id.* ¶ 14.) B.P.'s parents had authorized B.P., who was 15 years old at the time, to participate in the camp on the condition that B.P. stay in the same room as the head varsity cheerleading coach, Defendant Brittny Saavedra ("Coach Saavedra"). (*Id.* ¶ 19.) Although Coach Saavedra had agreed to this arrangement, her boyfriend turned up at the Phoenix hotel, so Coach Saavedra moved B.P. into a different room. (*Id.* ¶¶ 19–21.) B.P. shared her new hotel room with two student-teammates and Ms. Salome Chavez, a 17-year-old Squad "chaperone."[2] (*Id.* ¶¶ 17, 21.)

On the evening of July 25, 2015, B.P. took a shower in the shared hotel room. (*Id.* ¶ 22.) Her two teammates, who had taken Ms. Chavez's smart phone, entered the bathroom. (*Id.* ¶¶ 21–22.) One of the girls held the phone over the shower and photographed B.P. (*Id.* ¶¶ 22, 47(a).) They "then pulled the shower curtain out of B.P.'s grasp[,]" and the second girl took "video of B.P.[,] naked and scared." (*Id.* at ¶ 22; *see also id.* ¶ 47(a).) The girls posted the video to Snapchat, a social media app, and shared it with approximately seven other teammates.[3] (*Id.* ¶¶ 24–25.) B.P.'s teammates "began to tease and harass B.P. about her body," making comments such as "she doesn't shave," "who would want to have sex with her," "her body ain't shit," and "didn't know girls still had hair on their vagina." (*Id.* ¶¶ 24, 47(f).)

Coach Saavedra's response

That same evening, "B.P. went to Coach Saavedra's hotel room to discuss the incident." (*Id.* ¶ 29.) Inexplicably, Coach Saavedra instructed B.P. to apologize to her teammates "for

---

[2] Coach Saavedra identified Ms. Chavez as a chaperone on a form she filled out related to the cheerleading camp: the "APS Request for Field or Activity Form." (Am. Compl. ¶¶ 16–17.) That same form "states, in bold, 'Chaperones must be 21 years of age or older.'" (*Id.* ¶ 15.) Ms. Chavez had graduated from WMHS two months prior to the cheerleading camp. (Am. Compl. ¶¶ 17–18.)
[3] Notes from a later interview of the Squad reveal that the entire cheerleading squad—19 student-athletes—saw the video. (*See id.* ¶¶ 16, 47(d).)

overreacting to a joke." (*Id.* ¶ 30.) Coach Saavedra told B.P. that she would not discipline the Squad members, because she did not want to ruin their trip. (*Id.* ¶ 31.) In fact, Coach Saavedra threatened to punish B.P. "by making her run during practice if B.P. ruined the trip for" the Squad. (*Id.* ¶ 32.) Coach Saavedra told B.P. that the "incident was no big deal because" one of the two girls who had perpetrated the incident "had previously taken photos and videos of another teammate" who was using the toilet, "and that teammate had not complained." (*Id.* ¶¶ 33, 51.)

At some point after the incident, B.P. told her parents what happened. (*Id.* ¶ 37.) B.P. attempted to notify hotel security, but Coach Saavedra and an assistant coach "became upset with B.P. when they saw her speaking with hotel security . . . , and they prevented security from further assisting B.P. and prevented B.P. from reporting to security what had occurred." (*Id.* ¶ 36.) When she spoke with B.P.'s mother the morning after the incident, Coach Saavedra asked that B.P.'s parents not contact the police department, because Coach Saavedra "did not want the teammates to get in trouble for the 'prank.'" (*Id.* ¶ 34.) Nevertheless, B.P.'s family alerted the Phoenix Police Department, which opened an investigation. (*Id.* ¶ 38.) Coach Saavedra "prevent[ed] witnesses from speaking with Phoenix police officers[,]" told "police there was no video[,] and fail[ed] to return phone calls from the Phoenix Police Department detective." (*Id.* ¶ 39.)

On July 26, 2015, Coach Saavedra attempted to have B.P. and the two girls engage in mediation. (*See id.* ¶ 58(a).) Coach Saavedra later emailed Defendant Shonn Schroer, WMHS's Athletic Director ("Athletic Director Schroer"), and stated, "I interviewed them all separately and then together to try and mediate the situation. I felt we weren't getting anywhere with mediation so I called [B.P.'s mother] and told her that [B.P.] is still very upset . . . ." (*Id.*) Later

that day, Coach Saavedra excluded B.P. from a WMHS Varsity Cheerleading Squad photo. (*Id.* ¶ 40.) In front of some of B.P.'s teammates, Coach Saavedra told B.P. that the two girls "were only playing a joke on her, this was just what girls did during sleepovers, and that B.P. was overreacting." (*Id.* ¶ 35.) Coach Saavedra also made "negative comments about B.P. to the other coaches and team members, including calling B.P. 'a baby[,'] saying that B.P. needed to get over it[,] . . . calling B.P. a bad teammate for reporting the incident to hotel security and police, and stating that" these types of incidents "are part of competing." (*Id.* ¶ 41.) Coach Saavedra and an assistant coach repeated these statements to B.P. on the flight home to New Mexico, "calling her 'a baby' who was 'overreacting' and that she simply needed to 'get over it.'" (*Id.* ¶ 42.)

In the weeks following the July 25, 2015 incident, Coach Saavedra demoted B.P. from her "flier" position on the varsity squad and "blamed B.P. for [a] two-week suspension of practices in front of the entire team . . . ." (*Id.* ¶ 44.) Coach Saavedra refused to coach B.P. and "continued to exclude her from team activities, including a team meeting with" Athletic Director Schroer on August 10, 2015. (*Id.* ¶¶ 44, 131(l).)

<u>Harassment from Squad members</u>

B.P. continued to experience "pervasive sexual harassment, distress and intimidation by her former teammates . . . ." (*See id.* ¶¶ 54, 58(c).) The Amended Complaint details these examples of the harassment: (1) "an incident on October 5, 2015, when B.P. was followed around campus by a former teammate involved in the July 25th incident and that teammate's mother" (*see id.* ¶ 69); (2) former teammates followed B.P. around campus and laughed at her (*id.* ¶ 70); and (3) three of the original seven teammates who "constantly made comments about" both B.P. and one of her friends, calling them "bitch friend" and "whore" (*id.* ¶ 73). Both Squad

members and coaches "so severely taunted and ostracized" B.P. "that she was forced to leave the" Cheerleading Squad. (*Id.* ¶¶ 65–66.)

The teammates did not limit their harassment to B.P. Both B.P.'s younger brother and one of B.P.'s friends (also a former member of the WMHS Varsity Cheerleading Squad), "also experienced continued pervasive sexual harassment, distress, and intimidation by B.P.'s former teammates . . . and students of WMHS . . . ." (*Id.* ¶¶ 71–72.)

<u>The response from WMHS and APS officials</u>

WMHS officials interviewed Squad members on August 4 and 5, 2015. (*Id.* ¶ 47.) At least one teammate confessed to videotaping B.P. (*Id.* ¶ 28.) School officials defined the July 25, 2015 incident as "Bullying/Intimidation" in an August 10, 2016 disciplinary record and as "harassment/bullying" in an August 19, 2015 email. (*Id.* ¶¶ 55–56.) School officials knew that the behavior of all of the teammates—those who took the photographs and video and those who viewed the video—was both criminal and contrary to the APS Athletic and Activity Code of Conduct and the APS Student Behavior Handbook. (*Id.* ¶¶ 26–27, 48.)

B.P.'s family insisted that WMHS "administration take action against the teammates responsible for the" original incident. (*Id.* ¶ 44.) At an August 14, 2015 meeting between B.P., her parents, Athletic Director Schroer, APS Officer Deb Romero, and Defendant Deborah Gartman, ("Assistant Principal Gartman"),[4]  B.P.'s family learned that school officials disciplined only one of the girls—the one who had confessed to videotaping B.P.—but the girl would remain on the Squad. (*Id.* ¶ 45.) School officials did not discipline any of the Squad members who viewed the video or the second teammate, the girl who had taken photographs of B.P., despite the fact that "Coach Saavedra had actual knowledge that this teammate had previously taken photographs and video footage of another" Squad member. (*Id.* ¶¶ 48–49, 51–

---

[4] At the time of the incident, Ms. Gartman was Acting Principal of WMHS. (*Id.* ¶ 6.)

52, 60.) While one APS official, Toby Herrera, Director of the Student Service Center, "suggested the teammates involved in the July 25, 2015 incident be removed from the [Squad] for the year[,]" his "suggestion was disregarded." (*Id.* ¶ 59.)

Handwritten notes from an unidentified WMHS official show that B.P.'s father "expressed concerns that the incident was being downplayed, and . . . that B.P. was afraid and was shunned for reporting the incident." (*Id.* ¶ 46.) APS School Board Member Dr. Don Duran acknowledged in an August 18, 2015 "email that APS officials were aware of" continuing harassment: "[B.P.'s father] believes his daughter is still being harassed even though [Athletic Director Schroer] has warned the girls that the video needs to be destroyed and the harassment needs to stop." (*Id.* ¶ 57.) On August 20, 2015, Mr. Toby Herrera emailed Defendant Mark A. Garcia ("Principal Garcia"), Assistant Principal Gartman, and Athletic Director Schroer, and indicated:

> B.P.'s father "is quite concerned about what he feels is a lack of support of his daughter and a lack of action against the two students who were directly involved in the videotaping of his daughter . . . [. B.P.'s father] believes this whole event is interfering with her education. She continues to be teased by WMHS students (male and female) who have been told of the events, and continues to have cheerleaders laughing at her as they pass by."

(*Id.* ¶ 61.) Following the October 5, 2015 incident where a former teammate and that teammate's mother followed B.P. around campus, B.P.'s mother emailed Principal Garcia and stated:

> The girls were told over and over to drop this yet it continues. Making it hard for my child to even go to school. She is no longer cheering because of this yet it is continuous behavior. I am requesting your help in this matter as my child does not feel safe at school.

(*Id.* ¶ 69.) The Squad members who continued to harass and bully B.P. were never disciplined. (*Id.* ¶ 54.)

"Other members of the . . . Squad also quit the team because of the ongoing student-on-student sexual harassment and the deliberate indifference expressed by [WMHS] administrators and staff . . . ." (*Id.* ¶ 67.) When parents of other cheerleaders contacted WMHS officials to voice concern about the incident, WMHS "administrators and staff, including Athletic Director Schroer, . . . responded by stating that this was what was to be expected in the sport of cheerleading." (*Id.* ¶ 68.)

In response to the original incident and the continued harassment of B.P. by her former teammates, WMHS officials suggested mediation on several occasions: (1) Coach Saavedra attempted mediation between B.P. and the two teammates on July 26, 2015; (2) Assistant "Principal Gartman and a school counselor drafted an email to B.P.'s mother encouraging mediation" on August 6, 2015; (3) Assistant Principal Gartman emailed B.P.'s mother on October 6, 2015, suggesting that "B.P. mediate with the students who continued to bully and harass her"; and (4) on October 7, 2015, Principal Garcia and a school counselor "met with B.P. to have her consider mediation with one of the teammates who had taken her nude photograph and continually harassed her." (*See id.* ¶ 58(a)–(d).) The counselor later emailed Principal Garcia and stated, "I spoke to [B.P.] for a brief time after we left your office. She continued to refuse the mediation . . . . She came back to my office with the business card for her lawyer." (*Id.* ¶ 58(d).) The APS Bullying and Cyberbullying Behavior Prevention Training for Staff provides that "MEDIATION IS NOT APPROPRIATE if bullying is indicated." (*Id.* ¶ 58.)

B.P. also experienced the following incidents from WMHS officials: (1) Athletic Director Schroer refused "to let B.P. discuss the July 25, 2015 incident with her former advisor at" WMHS; (2) Principal Garcia called one of B.P.'s friends into his office to ask whether he was dating B.P. and to warn "him that B.P. was 'drama'"; and (3) WMHS "administrators told the

principal of [B.P.'s] proposed transfer school that if he accepted B.P. into his school, he would have nothing but drama." (*Id.* ¶ 77(a)–(c).)

On October 7, 2015, B.P.'s mother "submitted a transfer request to [APS] for B.P. and B.P.'s younger brother. The basis for both transfer requests was student safety stemming from the July 25th incident." (*Id.* ¶ 85.) With the transfer still pending, B.P.'s mother spoke with the principal of the proposed transfer school on January 7, 2016. (*Id.* ¶ 89.) "The principal signed transfer documents allowing B.P. to begin classes immediately at the transfer school." (*Id.*) B.P.'s mother then went to WMHS "to sign papers to withdraw B.P. and B.P.'s younger brother from" WMHS. (*Id.* ¶ 90.) Later that day, Defendant Cynthia Soo Hoo, APS's Executive Director of Compliance for the Special Education Department ("ED Soo Hoo"), left voicemail messages for B.P.'s parents, stating that B.P.'s transfer "could not be accomplished unless and until B.P., through her parents, signed a release that settled any and all claims the child or her parents had or might have had against any APS entity, agent, or employee" (the "Release"). (*Id.* ¶ 91.) This condition applied to B.P. only, not to her brother. (*Id.* ¶ 93.) "APS'[s] official transfer policy does not require a release of liability claims before a student is allowed to transfer." (*Id.* ¶ 95.) APS had actual knowledge that B.P.'s family had retained legal counsel and intended to file a civil tort claim, as their attorney had filed at least two Tort Claim Notices with the Interim-Superintendent in August and September, 2015. (*Id.* ¶¶ 101–02.)

Despite ED Soo Hoo's request, B.P.'s mother went to the transfer school on January 8, 2016, to begin the enrollment process. (*Id.* ¶ 108.) A transfer school official told B.P.'s mother "that he had been instructed by APS to reverse the transfer of B.P. pending further instructions from APS[] administration." (*Id.* ¶ 109.) B.P.'s brother's transfer went through with no problem. (*Id.* ¶ 114.) B.P.'s attorney filed a Temporary Restraining Order on B.P.'s behalf. (*Id.* ¶ 116.)

After B.P.'s attorney filed the Temporary Restraining Order, APS officials "finally relented and agreed to allow B.P. to transfer schools on January 11, 2016." (*Id.* ¶ 117.)

## II.     Legal Standard

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (quotation omitted). "To survive a motion to dismiss," the complaint does not need to contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility does not equate to probability, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556.)

"A motion to dismiss under Rule 12(b)(6) 'should be made before filing the answer or in the answer itself.'" *Five Star Automatic Fire Prot., LLC v. Nuclear Waste P'ship, LLC*, Civ. No. 14-622 JCH/GBW, 2016 WL 9447764, at *2 (D.N.M. May 13, 2016) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002) (alteration in original); citing Fed. R. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.")). "If the motion to dismiss is made after filing the answer, the motion should be treated as a motion for judgment on the pleadings under Rule 12(c)." *Id.* (citing *Jacobsen*, 287 F.3d at 941 n.2 (internal citations omitted)). "The same standard applies to a Rule 12(b)(6) motion or a Rule 12(c) motion, however." *Id.* (citing *Jacobsen*, 287 F.3d at 941 n.2

(internal and subsequent citations omitted)). "The analysis and result is 'the same regardless of the finer procedural distinctions . . . .'" *Id.* (quoting *Borde v. Bd. of Cty. Comm'rs of Luna Cty., N.M.*, 514 F. App'x. 795, 799 n.5 (10th Cir. 2013)).

## III.    Analysis

Plaintiff brings a claim under Title IX in Count I of her Amended Complaint. (*See* Am. Compl. ¶¶ 124–35.) Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." *See* 20 U.S.C. § 1681(a); *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008).

Plaintiff brings her Title IX claim under two theories: first, APS was deliberately indifferent to the known sexual harassment of B.P. by other students from July 25, 2015 through January 11, 2016; and second, APS officials retaliated against B.P. for reporting this sexual harassment. (*See* Doc. 67 at 3.) "A school recipient of federal funds may be liable under Title IX for its own conduct in being deliberately indifferent to student-on-student sexual harassment[,]"*Rost*, 511 F.3d at 1119 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999)), "teacher-student sexual harassment[,]" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), or for retaliating against a person who has complained about sexual harassment or discrimination, *see C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1336 (D. Kan. 2008) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005)). *See also Tackett v. Univ. of Kan.*, 234 F. Supp. 3d 1100, 1106 (D. Kan. 2017) (Title IX "encompasses sexual harassment that creates an educational environment sufficiently hostile to deprive the

student of access to the educational opportunities or benefits provided by the school") (internal citation omitted).

To hold APS liable under Title IX for its purported deliberate indifference to sexual harassment, Plaintiff must allege facts sufficient to show: (1) APS had actual knowledge of and (2) was "deliberately indifferent to, (3) harassment that [was] so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school." *Rost*, 511 F.3d at 1119 (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999)). Defendants' Motion rests on one basic argument: that Plaintiff's Amended Complaint fails to allege facts sufficient to show that the harassment was based on her gender. (*See* Doc. 64 at 7–19.)

### A.    Gender-Based Harassment

####    1.    Plaintiff has alleged facts sufficient to show that the July 25, 2015 harassment was gender-based.

Plaintiff avers that the cheerleaders harassed B.P. because of her gender. Specifically, Plaintiff asserts that the harassment "was motivated by [B.P.'s] harassers' beliefs that B.P.'s behaviors, mannerism[s], and appearances did not conform to their stereotypes of attractive femininity." (Doc. 67 at 3.) The parties do not dispute that "same-sex student-on-student harassment is actionable under Title IX . . . ." *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 963 (D. Kan. 2005) (citations omitted). (*See also* Docs. 67 at 4–8; 70 at 2.) Defendants simply believe that Plaintiff fails to allege facts to show "that the harassment by [B.P.'s] fellow students was based on a failure to conform to accepted gender norms . . . ." (Doc. 70 at 3.) The Court finds that while the July 25, 2015 harassment was likely based on sex, the bulk of the harassment, which occurred after July 25, 2015, was not.

To succeed on a same-sex harassment claim, a plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimination . . .* because of . . . sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (brackets and quotation marks omitted). While the *Oncale* Court was examining a harassment claim under Title VII, "courts routinely look to Title VII case law for guidance in evaluating Title IX claims, *see, e.g., Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."). *Theno*, 377 F. Supp. 2d at 964 (internal citations omitted). The *Oncale* Court "gave examples of three evidentiary methods by which a same-sex plaintiff can show that the harassment was based on sex." *Id.* (discussing *Oncale*, 523 U.S. at 80–81) (subsequent citation omitted). The plaintiff may: (1) "show that the harassment was motivated by sexual desire"; (2) "show that the harasser was motivated by a general hostility to the presence of the same gender in the workplace"; or (3) "offer direct comparative evidence about how the harasser treated both males and females in a mixed-sex workplace." *Id.* (citing *Oncale*, 523 U.S. at 80–81). Courts have also allowed plaintiffs to prove actionable harassment under a fourth method: gender stereotyping. *Id.* (gathering cases).

Gender stereotyping occurs where a victim fails to meet his or her peers' stereotyped expectations of masculinity or femininity. *See id.* at 965 (citations omitted); *see also* Office of Civil Rights, Revised Sexual Harassment guidance: Harassment of Students by School Employees, Other Students, or Third Parties, at *v, 66 Fed. Reg. 5512-01, 2001 WL 42238 (Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf (last visited January 4, 2018) (noting that "it can be discrimination on the basis of sex to harass a student on

the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity").

In *Theno*, for example, the plaintiff was caught masturbating in the bathroom when he was in seventh grade. *Theno*, 377 F. Supp. 2d at 965. For the next four years, his fellow students teased and harassed the plaintiff because of the incident. *Id.* The other students called him names, physically assaulted him, made "crude gestures with various sexual overtones[,]" "made crude drawings and teased him because he was perceived to be a masturbator . . . ." *Id.* at 954, 965. The court denied the defendant's motion for summary judgment and held that "a rational trier of fact could infer that plaintiff was harassed because he failed to satisfy his peers' stereotyped expectations for his gender because the primary objective of plaintiff's harassers appears to have been to disparage his perceived lack of masculinity." *Id.* at 965.

> The fact that plaintiff's peers made crude drawings and teased him because he was perceived to be a masturbator, when combined with arguably related crude name-calling, reflects that plaintiff's harassers believed that he did not conform to male stereotypes by *not* engaging in such behavior at school, i.e., that he did not act as a man should act.

*Id.*

The allegations in Plaintiff's Amended Complaint support her theory that B.P.'s teammates harassed her on July 25, 2015, based on their notions of attractive femininity. Their statements ("she doesn't shave," "who would want to have sex with her," "her body ain't shit," and "didn't know girls still had hair on their vaginas") are evidence that B.P.'s teammates believed B.P. did not conform to their ideas of the stereotypical feminine appearance. Yet, there are no allegations to show that the teammates continued to harass B.P. *after* July 25, 2015, based on her appearance. This is distinguishable from *Theno*, where the plaintiff experienced

harassment based on the students' stereotyped expectations of masculinity for four years after the initial incident.

### 2. Plaintiff fails to allege facts sufficient to show that B.P. experienced gender-based harassment after July 25, 2015.

Plaintiff asserts in her Amended Complaint that "B.P. experienced continued pervasive sexual harassment[,]" (Am. Compl. ¶ 69), but Plaintiff fails to support this legal conclusion with any specific factual allegations that demonstrate how B.P.'s fellow students harassed her *based on her gender* after July 25, 2015. The Court can find only four factual assertions that describe any post-July 25, 2015 student-on-student harassment: (1) "an incident on October 5, 2015, when B.P. was followed around campus by a former teammate involved in the July 25th incident and that teammate's mother" (*see* Am. Compl. ¶ 69); (2) former teammates followed B.P. around campus and laughed at her (*id.* ¶¶ 70, 131(t)); (3) three of the original seven teammates who "constantly made comments about" both B.P. and one of her friends, calling them "bitch friend" and "whore" (*id.* ¶ 73); and (4) Squad members "so severely taunted and ostracized" B.P. "that she was forced to leave the" Cheerleading Squad (*id.* ¶¶ 65–66). These allegations are inadequate to show that any later harassment was based on B.P.'s gender or appearance.

Plaintiff does not contend that the teammates' use of the words "bitch" and "whore" are gender-based or relate to B.P.'s appearance, and any such argument would be futile. As the court noted in *Theno*, "name-calling, standing alone, probably would not be sufficient to" demonstrate gender-based harassment. *Theno*, 377 F. Supp. 2d at 965 (gathering cases). Other courts have come to the same conclusion. In *Benjamin v. Metropolitan School District of Lawrence Township*, No. 00-0891-C-T/K, 2002 WL 977661, (S.D. Ind. Mar. 27, 2002), fellow students called the plaintiff "bitch," "whore," and "slut." *Benjamin*, 2002 WL 977661, at *1. The court found that while these terms may have some sexual connotation, there was no showing that the

harassing conduct was based on the plaintiff's sex and, thus, the name-calling did not constitute sexual harassment. *Id.* at *3–*4. In *Burwell v. Pekin Community High School District 303*, 213 F. Supp. 2d 917 (C.D. Ill. 2002), the plaintiff demonstrated she "was called sexual names, such as bitchy, pussy, and slut, . . . on a 'daily' basis" and alleged that the students harassed her "because she did not conform to [their] sex-based stereotypes of females." *Burwell*, 213 F. Supp. 2d at 930. The court found, though, that there was little evidence to support plaintiff's speculation regarding the students' motivation to call her names. *Id.* Regardless, the court noted, the name-calling by itself was not sufficiently egregious to support a claim for sexual harassment under Title IX. *Id.* at 930–31 (discussing cases where students had successfully brought claims under Title IX). *See also Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 197 (D. Conn. 2016) (finding evidence plaintiffs' fellow students called him "pussy," "bitch," and "baby" were insufficient to show harassment based on gender). *But see Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 223, 225, 228 (D. Conn. 2006) (denying motion for summary judgment where plaintiff presented evidence that her fellow students engaged in verbal taunting and slurs toward her "on a near daily basis" for almost an entire school year due to their belief that she was a lesbian).

Confusing Plaintiff's claim of continued sexual harassment is her allegation that the harassment continued because B.P. reported the July 25, 2015 incident. (Am. Comp. ¶ 133 ("There was also no dispute as to subsequent and continued pervasive sexual harassment against [B.P.] by her peers and APS employees *for reporting the criminal conduct* perpetrated against her.") (emphasis added).) It is difficult to read this allegation as support for the theory that the later harassment was based on B.P.'s sex, when Plaintiff also theorizes that the harassment came as retaliation for B.P.'s report.

Equally fatal to Plaintiff's claim of continued sexual harassment are her allegations, made without any factual support, that both B.P.'s brother and friend *also* experienced "pervasive sexual harassment" from B.P.'s former teammates. (*Id.* ¶¶ 71–72, 162.) Any implication that the students also "sexually harassed" B.P.'s brother and friend only serves to take away from Plaintiff's assertion that the harassment B.P. experienced was based on the students' stereotyped ideas of attractive femininity. *See Salau v. Denton*, 139 F. Supp. 3d 989, 1000 (W.D. Mo. 2015) (noting that "[t]o determine whether discrimination was based on sex, 'Plaintiff must show that the harasser treated males and females differently'") (quoting *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 654–55 (8th Cir. 2003) (subsequent citation omitted)); *cf.*, *Benjamin*, 2002 WL 977661, at *3 (finding that where plaintiff alleged the sexual harassment from an ex-boyfriend was due to sexual desire, evidence of "harassment by other individuals besides [the ex-boyfriend] could hardly said to be based on sexual desire").

The Court finds this oft-quoted language from *Davis* apposite here:

> Courts . . . must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651–52 (citation omitted). There are simply no allegations in the Amended Complaint to demonstrate that students harassed B.P. based on her appearance after July 25, 2015. Instead, the allegations generally describe students laughing at B.P. and calling her names unrelated to any stereotypical notions of femininity. Consequently, the Court must examine

whether the single evening of gender-based harassment on July 25, 2015, is sufficient to state a claim under Title IX.

### 3. Plaintiff fails to show that any gender-based harassment was pervasive.

Plaintiff has alleged facts sufficient to show that she experienced gender-based harassment on July 25, 2015. Plaintiff fails to state a plausible claim under Title IX, however, because she has not shown that the harassment was pervasive. *See Murrell*, 186 F.3d at 1246. The Court notes that the girls' conduct on July 25, 2015, in teasing B.P. about her appearance would not be enough in itself to rise to the level of "severe" or "objectively offensive." *See id.* But these insults, coupled with the two teammates' decision to share the video to a social media app, warrant such descriptors.

"On the other hand, the Court has difficulty finding this sexual harassment to be pervasive." *Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1082–83 (D.N.M. 2010) (citing *The American Heritage Dictionary of the English Language* at 1353, 1349 (("per•va•sive . . . Having the quality or tendency to pervade or permeate."); ("per•vade . . . To be present throughout; permeate"); ("per•me•ate . . . To spread or flow throughout"))). The harassing conduct occurred on only one evening. "Although the Court recognizes that, in the discrimination context, the Tenth Circuit has found that 'pervasiveness' is not solely based on the number of occurrences, the Court finds it unlikely that the Tenth Circuit would consider" this single evening of harassment "to be pervasive." *Id.* at 1083 (citing *Nieto v. Kapoor*, 268 F.3d 1208, 1219 n.8 (10th Cir. 2001) ("[W]hile courts have tended to count events over time to determine pervasiveness, the word 'pervasive' is not a counting measure. The trier of fact utilizes a broader contextual analysis.") (internal quotation omitted)). *Cf. Hill v. Cundiff*, 797 F.3d 948, 972 (11th Cir. 2015) ("A 'single instance of sufficiently severe one-on-one peer harassment'

cannot have such a systemic effect [of denying equal access to an education] in light of 'the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.'") (quoting *Davis*, 526 U.S. at 652–53).

In *Schaefer*, the court considered "four alleged instances of student-on-student assault over the course of two months" and found that the plaintiff had failed to show that the sexual harassment there was "pervasive." *Schaefer*, 716 F. Supp. 2d at 1082–83. Here, Plaintiff bases her claim under Title IX on months of alleged "sexual" harassment, but the Court has already found that the post-July 25, 2015 harassment was not based on B.P.'s gender. Consequently, Plaintiff's claim rests on only a single evening of gender-based harassment—much of which consisted of verbal taunting, which is not enough, by itself, to state a Title IX claim. Based on the Amended Complaint, Plaintiff has simply not stated facts to show the harassment was pervasive and, therefore, has failed to state a plausible claim under Title IX for gender-based harassment.

### B.    Retaliation by APS

Plaintiff's second theory under Title IX rests on the school officials' retaliatory actions to B.P.'s report of sexual harassment. "It is well-settled that retaliatory conduct is within the broad prohibition of 'discrimination' made unlawful by Title IX." *Tackett*, 234 F. Supp. 3d at 1108 (citing *Jackson*, 544 U.S. at 174). "To date, the Tenth Circuit does not appear to have expressly set forth the elements for a retaliation claim under Title IX. Courts that have addressed the issue have analyzed both Title IX discrimination and retaliation using Title VII standards." *Id.* at 1108–09.

> This means that to state a claim for retaliation under Title IX, a plaintiff must allege that: 1) he or she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action

was taken against plaintiff; and 4) there was a causal connection between the protected activity and the adverse action.

*Id.* (citing *Yan v. Penn State Univ.*, 529 F. App'x. 167, 171 (3d Cir. 2013); *Scott v. Metro. Health Corp.*, 234 F. App'x. 341, 346 (6th Cir. 2007)).

B.P. "clearly engaged in [at least one] act[] of protected activity by voicing [her] concerns and complaints to" Coach Saavedra about her former teammates' conduct. *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008). B.P. complained to Coach Saavedra on July 25, 2015, about the original incident of sexual harassment. (Am. Compl. ¶ 29.) The factual allegations in Plaintiff's Amended Complaint make clear that APS officials—at the very least, Coach Saavedra, Athletic Director Schroer, Principal Garcia, and ED Soo Hoo—had knowledge that B.P. reported the sexual harassment that occurred on July 25, 2015. Plaintiff alleges several adverse actions by APS officials: Coach Saavedra's discipline, alienation, and demotion of B.P. from the squad, and ED Soo Hoo's obstruction of B.P.'s transfer out of WMHS unless B.P. and her parents signed a release of claims against APS. (*See* Doc. 67 at 24.) The Court finds that these actions are objectively material and adverse. *See Somoza*, 513 F.3d at 1214.

Finally, there was a causal connection between the protected activity and the adverse action. "A causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *C.T.*, 562 F. Supp. 2d at 1337 (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007) (internal quotation omitted) (alteration in original)). Here, Coach Saavedra's actions closely followed B.P.'s reporting of the harassment. This is sufficient to meet the "causal connection" prong. Moreover, it is arguable that ED Soo

Hoo's attempt to obstruct B.P.'s transfer to another school stemmed from her original report of sexual harassment.

Defendants seem to argue that Plaintiff's claim for retaliation should fail because she did not sufficiently allege that she was harassed or retaliated against on the basis of her sex.[5] (Doc. 70 at 3.) This position miscomprehends the law, as "a retaliation claimant need not prove that the complained-of sex discrimination happened." *Jackson*, 544 U.S. at 187 (Thomas, J., dissenting). "Retaliation therefore cannot be said to be discrimination on the basis of anyone's sex, because a retaliation claim may succeed where no sex discrimination ever took place." *Id.* at 188.

The Court will not dismiss Plaintiff's retaliation claim under Title IX at this time. Plaintiff has alleged facts sufficient to state a plausible claim for relief.

## IV. Conclusion

Plaintiff fails to state a plausible claim for gender-based harassment, but she has stated a plausible claim for retaliation under Title IX. The Court will grant Defendants' Motion to Dismiss in part.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Dismiss Plaintiff's Title IX Claim for Failure to State a Claim (Doc. 64) is **GRANTED IN PART** as detailed in this Order.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

---

[5] Defendants only minimally addressed Plaintiff's retaliation claim in their Motion and Reply. (*See* Docs. 64, 70.)