# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RACHEL HIGGINS, as
Guardian Ad Litem for B.P.,
a minor child,

     Plaintiff,

v.                          No. CIV 17-0234 RB/LF

BRITTNY SAAVEDRA, in her personal capacity
acting under color of state law; DEBORAH GARTMAN,
in her personal capacity acting under color of state law;
MARK A. GARCIA, in his personal capacity acting under
color of state law; SHONN SCHROER, in his personal
capacity acting under color of state law; CYNTHIA
SOO HOO, in her personal capacity acting under color of
state law; and ALBUQUERQUE PUBLIC SCHOOL DISTRICT,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motion for Partial Summary Judgment on Plaintiff's Equal Protection Claim for Failure to State a Claim and on the Basis of Qualified Immunity, filed on April 11, 2017 (Doc. 41), and Plaintiff's Opposed Motion for Page Limit Extension for Plaintiff's Exhibits to Plaintiff's Supplemental Response to Defendants' Partial Motion for Summary Judgment on Plaintiff's Equal Protection Claim (Doc. 88), filed on November 1, 2017 (Doc. 93). Jurisdiction arises under 28 U.S.C. § 1331. Having considered the submissions of counsel and relevant law, the Court will **GRANT** both motions.

# I.    Factual Background[1]

B.P., a minor child and former student at West Mesa High School (WMHS), was a member of the WMHS Varsity Cheerleading Squad. (Am. Compl. ¶¶ 2, 13.) WMHS "is a public high school within the [Albuquerque Public School (APS)] District." (*Id.* ¶ 4.) On July 25, 2015, while on a trip to Phoenix, Arizona for a cheerleading camp, two of B.P.'s teammates took photographs and video of B.P. while she was in the shower. (*Id.* ¶¶ 14, 22, 47(a); *see also* Doc. 88-1 ¶ 2.) The two girls then shared the video with other teammates and posted it on Snapchat, a social media app. (Am. Compl. ¶¶ 24–25.) Over the next several months, B.P.'s teammates harassed her and made her feel unsafe at school. (*Id.* ¶¶ 54, 58(c); *see also* Docs. 88-1 ¶¶ 3–4; 88-4.) Both B.P.'s friend ("Gabby"),[2] and B.P.'s brother also experienced harassment at WMHS after the incident in Phoenix. (*See* Am. Compl. ¶¶ 71–72; Docs. 88-1 ¶ 7; 49-2 ¶¶ 2, 6.) The teens experienced harassment to such an extent that all three sought to transfer away from WMHS. (Docs. 49-2 ¶ 7; 88-1 ¶ 8.)

APS's Transfer Policy

APS students normally attend schools within certain attendance boundaries, which are determined by where the students live, but students "may apply for a transfer to attend a school outside of their assigned school area." (Doc. 88-8 at 1.) APS maintains an "Enrollment Priority Process" for students who request to transfer to a school outside their attendance boundaries. (*See id.*) Approvals for transfer requests depend on certain factors, first and foremost whether the requested transfer school has the capacity to accept another student ("site capacity"). (*Id.*) If the

---

[1] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to the Plaintiff. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court recites only that portion of the factual and procedural history relevant to this motion.

[2] B.P.'s friend, Gabby, was also a former cheerleader who quit the cheerleading team after the incident in Phoenix. (*See* Doc. 49-2 ¶¶ 2–5.)

school has site capacity, then APS grants transfers "using a random lottery selection process and priority system in compliance with state and federal requirements. Transfers [are not] first come, first served." (*Id.*) The Enrollment Priority Process (often referred to in the parties' briefs and exhibits as the "Transfer Directive" or "Transfer Policy") "identifies a hierarchy of five different enrollment priorities for APS students submitting transfer requests."[3] (Doc. 88 ¶ J; *see also* Doc. 88-8.)

Ms. Shelly Green, Executive Director of Student Services Center (the "Transfer Office"), which handles student transfers, testified about how the Transfer Office considers students with transfer requests. (*See* Docs. 88 ¶ U; 88-10.) All student transfer requests are automatically sorted by a computer program into a waiting list according to the priority levels described above. (Doc. 88-10 at 31:7–24, 32:11–15.) When a spot opens at a school with a waiting list of students, an employee from the Transfer Office looks at the waiting list and selects the student with the highest priority as determined by the computer program. (*See id.* at 31:2–34:3.) The waiting list

---

[3] The enrollment priorities are defined as follows:

Priority 1: "[s]tudents residing within the assigned geographical attendance area of the school and students" who are dependents of certain active military parents/legal guardians;

Priority 2: "[s]tudents enrolled in . . . [a] school ranked as a school in need of improvement (SINOI) requesting a school which is a non-SINOI school";

Priority 3: "[s]tudents who previously attended the school";

Priority 4(a): "[s]tudents who have siblings already attending the school requested and will be attending simultaneously";

Priority 4(b): students who have one of the following "enrollment preferences":

(1): "students who have other siblings requesting the same school but none are currently attending the requested school";

    (2): "students who are children of an employee of the school being requested";

    (3): "students who have at least one parent/legal guardian who is" active military;

Priority 4(c): "students who qualify for one of the following preferences":

    (1): "after-school care for students";

    (2): "child care for siblings of students attending the requested school";

    (3): "extreme hardship";

    (4): "location of the student's previous school";

    (5): "student safety";

    (6): other preferences;

Priority 5: "all other applications."

(Docs. 88-8 at 1; 88-9; *see also* Doc. 88 ¶ J & n.4.)

includes both general education students (students who do not receive special education services) and students who receive "C or D level" special education services.[4] (*Id.* at 27:11–20, 32:15–18; 36:21–24.) The waiting list specifically identifies any students who receive "C or D level" special education services. (*Id.* at 27:11–20, 32:15–18.) If the highest priority student on the waiting list is identified as receiving "C or D level" special education services, the Transfer Office employee then passes the transfer request to the special education department to determine whether there is program availability at the requested school. (*Id.* at 22:1–23:4; 27:16–21.) If there is availability in the special education program, then the Transfer Office will approve the transfer request. (*Id.* at 22:1–23:1; 27:11–21.) The Enrollment Priority Process has three listed "exceptions"—situations in which the superintendent or a designee may "exempt a student from the transfer process." (Doc. 88-8 at 2–3.) The exceptions include: (1) "when the enrollment/transfer enhances the child's welfare;" (2) "when the enrollment/transfer is in the best interest of the district; or" (3) "when the enrollment is sponsored by a member of the superintendent's leadership team and approved by the superintendent."[5] (*Id.*)

Ms. Green testified that where a student is being bullied and wants to transfer to a school that does not have site capacity, an associate superintendent has authority to force the transfer through.[6] (*Id.* at 42:5–11.) If an associate superintendent attempts to force a transfer through for a student receiving C or D level special education services, however, the receiving school will still need to have capacity for the student in its special education program. (*Id.* at 43:11–21.)

---

[4] "C or D level" refers to the number of hours a student receives special education services. (Doc. 88-24 at 26:1–11.)
[5] Defendants dispute this fact to the extent that these exceptions do not give "authority to order a special education student's transfer to a school [that] has no capacity for that student." (Doc. 91 at 6.) Defendants point out that Ms. Green could not remember "this process ever being completed for a special education student." (Doc. 91 at 7 (citing Doc. 88-10 at 42:23–43:2).) The Court finds that this dispute is not material to its decision.
[6] It is unclear whether Ms. Green's testimony on this point specifically refers to one of the three Enrollment Priority Process exceptions. (*See* Doc. 88-8 at 2–3.)

B.P.'s Transfer Troubles

On October 7, 2015, B.P.'s mother electronically submitted a transfer request for both B.P. and B.P.'s brother, requesting that they be transferred from WMHS to Albuquerque High School (AHS) due to safety concerns. (Doc. 88-1 ¶¶ 8, 11; Am. Compl. ¶ 85; *see also* Docs. 88-1-C; 88-6.) "B.P.'s and her brother's transfer requests were both Enrollment Priority 4(b)(1) because they requested transfers as siblings and for student safety reasons."[7] (Docs. 88 ¶ J; 88-6; 88-10 at 28:8–29:12.) B.P.'s mother "called the Transfer Office for the school district that same day . . . to confirm that [her] transfer requests had been received. [She] was told that [APS] was not approving any transfers until the holidays were over unless the school principal agreed that student safety was a concern." (Doc. 88-1 ¶ 9.)

In January 2016, after the winter holidays, B.P.'s mother called the Transfer Office again "to inquire about the status of [her] transfer requests . . . ." (*Id.* ¶ 11.) She states that the woman from the Transfer Office told her that her "son's transfer had been approved, but that B.P.'s transfer was not approved. . . . [T]here was no reason listed explaining why B.P. was not being allowed to transfer[,]" and "she could see spots for [tenth] graders at AHS, which is the grade B.P. was in." (*Id.*) The woman recommended that B.P.'s mother "contact the principal of [AHS] because the principal of a given school could open up space if space was not otherwise available." (*Id.*)

On January 5, 2016, B.P.'s parents went to AHS to meet with the school's principal— Tim McCorkle (Principal McCorkle). (*Id.* ¶ 12.) They explained that because B.P. has a dyslexia diagnosis, she had an Individualized Education Program (IEP) and required minor

---

[7] Defendants apparently dispute Plaintiff's categorization of B.P.'s and her brother's transfer request as 4(b)(1), because "Ms. Green never testified to B.P.'s specific priority level." (Doc. 91 at 6 ¶ 4.) While Defendants' statement is correct, the Court feels comfortable making the logical deduction that B.P's and her brother's transfer requests fall into the category of siblings requesting the same school. Any dispute on this issue, however, is not material.

accommodations including "extra time on tests and no penalties for spelling errors." (*Id.*; Docs. 41-A ¶ 4; 88-10 at 60:13–19.) In fact, B.P. received C level special education services at WMHS. (Docs. 41-B at 1 (B.P.'s "IEP amounts to C-level support"); 88-10 at 61:22–62:3 (B.P. "would have been on the waiting list as a C level student").) B.P.'s brother, however, was a general education student. (Docs. 41-A ¶ 4; 88-10 at 60:13–19.)

Principal McCorkle told B.P.'s parents that "he was fine with B.P. coming to [AHS] because her special education accommodations were so minimal." (Doc. 88-1 ¶ 12.) He also asked them how they "felt about moving B.P. to regular education classes so she could transfer to [AHS] because special education was full."[8] (*Id.*; *see also* Doc. 88-5 at 2 (typed copy of Principal Mark Garcia's handwritten notes stating that Principal McCorkle called Assistant Principal Dooley and "communicated that [B.P.'s] parents wanted to take her out of special-Ed [sic] because AHS could not accommodate her needs as a special Education student").) Principal McCorkle then called Rae Lynn Dooley, an Assistant Principal of Special Education at WMHS (Assistant Principal Dooley). (Doc. 88-1 ¶ 13.) Principal McCorkle asked Assistant Principal Dooley to begin paperwork to remove B.P. from the special education program so she could transfer as a general education student to AHS. (*Id.*)

Later that day, B.P.'s parents went to WMHS to meet with Defendant Mark Garcia (Principal Garcia) and Assistant Principal Dooley. (*Id.* ¶ 14.) In that meeting, Principal Garcia and Assistant Principal Dooley told B.P.'s parents "that it was not in B.P.'s best interest to transfer schools because [WMHS] offered her help with her dyslexia and the new school would

---

[8] Principal McCorkle testified that he does not recall advising B.P.'s parents to withdraw B.P. from the special education program. (Doc. 88-13 at 19:16–25.) The Court finds this discrepancy immaterial for purposes of its analysis. Additionally, Plaintiff contends that Defendants have failed to establish that AHS did not have capacity in its special education program. (*See* Doc. 88 at 10.) The Court finds this contention curious, as Plaintiff submitted an affidavit from B.P.'s mother, who stated that Principal McCorkle said that AHS's special education program was full. (Doc. 88-1 ¶ 12.) Regardless, whether AHS's special education program was full is immaterial for purposes of the Court's decision.

not." (*Id.*) B.P.'s mother explained that the environment at WMHS was not safe for B.P., and that B.P.'s brother's transfer to AHS had already been approved. (*Id.*) Against B.P.'s parents' wishes, Principal Garcia and Assistant Principal Dooley refused to approve the withdrawal at that time. (*Id.*; *see also* Doc. 88-5 at 2.)

On January 6, 2016, B.P.'s mother went to AHS to enroll her son. (*Id.* ¶ 15.) She explained to Principal McCorkle what had happened when she tried to withdraw B.P. from the special education program, and he said that he would sign B.P.'s transfer request "with full special education accommodations."[9] (*Id.* ¶ 16.) Later on January 6, 2016, Ms. Cynthia Soo Hoo, the Executive Director of Compliance for the APS Special Education Department ("ED Soo Hoo"), called B.P.'s mother. (*Id.* ¶ 18; Am. Compl. ¶ 9.) ED Soo Hoo told B.P.'s mother "that APS would only allow [B.P.'s] transfer and provide her with the appropriate special education services at the new school on the condition that [they] drop [their] legal claims against APS."[10] (Doc. 88-1 ¶ 18.) ED Soo Hoo also told B.P.'s mother that B.P. would not be allowed to start school at AHS "unless [they] signed a settlement agreement promising not to sue APS." (*Id.*) ED Soo Hoo left a similar voicemail message for B.P.'s father, stating additionally that the transfer approval was in error "because there [were] several students on the waiting list for" AHS. (Doc. 88-19; *see also* Doc. 88-1 ¶ 18.) ED Soo Hoo emailed a copy of the proposed settlement agreement to B.P.'s mother on January 7, 2016. (Doc. 88-1 ¶ 21[11]; *see also* Doc. 88-1-B.)

---

[9] The parties dispute exactly when B.P. officially registered at AHS and whether Principal McCorkle had authority to approve B.P.'s transfer outside of the normal transfer process. (*See* Docs. 88 ¶ Q & at 13; 91 at 8.) The Court finds these disputes are immaterial for purposes of its analysis.

[10] It is undisputed that at the time ED Soo Hoo contacted B.P.'s parents, APS had notice of B.P.'s pending tort claims. (*See*, *e.g.*, Docs. 88-2, 88-3 (Tort Claims Act Notice and Preservation of Records Requests mailed to APS in August and September 2015).)

[11] B.P.'s mother's affidavit lists the date as January 7, 2017, which the Court presumes is a typographical error.

On January 8, 2016, B.P.'s attorney filed a Temporary Restraining Order on B.P.'s behalf.[12] (Doc. 88-1 ¶ 27; Am. Compl. ¶ 116; *see also* Doc. 88-23.) On Monday, January 11, 2016, APS officials allowed B.P. to enroll at AHS without signing the settlement agreement. (Doc. 88-1 ¶ 28.)

B.P.'s friend, Gabby, "requested a transfer out of [WMHS] in April 2016" due to "bullying and harassment." (Doc. 49-2 ¶ 7.) Gabby's mother had no issue withdrawing Gabby from WMHS, and she did not have to sign a settlement agreement in order to withdraw Gabby. (*Id.* ¶¶ 8–9.)

## II.    Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

---

[12] Defendants dispute that the Temporary Restraining Order was ever actually filed, but the Court does not find this dispute material for purposes of its analysis. (*See* Doc. 91 at 9.)

issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted). The party opposing a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). Rule 56(c) provides that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The respondent may not simply "rest on mere allegations or denials of [her] pleadings." *Anderson*, 477 U.S. at 259; *see also Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) ("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.") (quotation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008) (citing Fed. R. Civ. P. 56(e); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).

**III.    Analysis: The Court will grant summary judgment to Defendants on Plaintiff's equal protection claim.**

Defendants argue that Plaintiff is unable to "establish that B.P. was treated differently than others 'similarly situated in every material respect.'" (Doc. 41 at 16.) The crucial distinction rests upon the fact that B.P., who had an Individual Education Program (IEP) that required her to receive certain accommodations in school, was in APS's special education program. (*See id.* at 16–17; Docs. 41-A ¶ 4; 88-1 ¶ 12; 88-10 at 60:13–19.) There is no evidence that either B.P.'s brother or B.P.'s friend, Gabby, had IEPs or were in APS's special education program. (Docs. 41-A ¶ 4; 49-2; 88-10 at 60:13–19.)

**A.    The elements of an equal protection "class-of-one" claim.**

Plaintiff asserts a claim of discrimination against "all Defendants" under the Equal Protection Clause. (Am. Compl. ¶¶ 159–73.) Plaintiff frames the question as "whether Defendants denied B.P. equal protection under the law by singling her out from similarly situated students requesting transfers and imposing upon her an additional irrational, arbitrary, and abusive burden in order to approve her transfer out of" WMHS. (Doc. 49 at 15; *see also* Doc. 88 at 17 ("the true constitutional right at issue is B.P.'s clearly established constitutional right to be free from targeted and irrational unequal treatment under clear and official transfer standards")).) "Plaintiff does not claim that the unequal treatment of [B.P.] was due to her membership in any protected class or racial or gender group. Rather, she asserts that she suffered discrimination as a 'class-of-one.'" *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1210 (10th Cir. 2004). (*See also* Doc. 49 at 11.)

"In the paradigmatic class-of-one case, a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." *Jicarilla Apache Nation*

10

*v. Rio Arriba Cty.*, 440 F.3d 1202, 1209 (10th Cir. 2006) (citation omitted). The Tenth Circuit counsels caution, however, in applying the class-of-one theory, as applying the theory "too broadly could transform the federal courts into 'general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.'" *Id.* (quoting *Jennings*, 383 F.3d at 1211).

"A class-of-one equal protection claim has two essential elements. First, the plaintiff must establish that the government official or entity intentionally treated it differently from those who are similarly situated." *Highland Dev., Inc. v. Duchesne Cty.*, 505 F. Supp. 2d 1129, 1150 (D. Utah 2007) (citing *Grubbs v. Bailes*, 445 F.3d 1275, 1282 (10th Cir. 2006)). "Second, the plaintiff must show 'that the official action was *objectively* irrational and abusive . . . .'" *Id.* (quoting *Jicarilla Apache Nation*, 440 F.3d at 1211).

**B.      Plaintiff fails to establish that B.P. was similarly situated to any relevant comparator.**

"The key to the first element of a class-of-one claim is to establish a similarly situated comparator. The question of whether individuals are similarly situated is a factual question." *Id.* "But 'a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met.'" *Id.* (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) (internal citations omitted)). The Court finds here that, as a matter of law, Plaintiff fails to satisfy this element.

"The requirement that a plaintiff show that similarly situated persons were treated differently 'is especially important in class-[of-]one cases.'" *Jicarilla Apache Nation*, 440 F.3d at 1212 (quotation omitted)). Plaintiff must show B.P. is similarly situated "in all material respects," and "cannot prevail if there is *any* material difference between [B.P.] and allegedly

similarly situated parties that relates to a governmental interest." *Id.* at 1212, 1213. "This is a heavy burden." *Highland Dev., Inc.*, 505 F. Supp. 2d at 1151 (citing *Jicarilla Apache Nation*, 440 F.3d at 1212 ("when the class consists of one person or entity, it is *exceedingly difficult* to demonstrate that any difference in treatment is not attributable to a quirk of the plaintiff or even to the fallibility of administrators whose inconsistency is as random as it is inevitable"); *Jennings*, 383 F.3d at 1214 ("It is . . . imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class."); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) ("class-of-one plaintiff must show that 'no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy'"), *overruled on other grounds*, *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) (internal citation omitted); *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) ("requiring class-of-one plaintiff to show it is '*prima facie identical* [to the proposed comparator] in all relevant respects'") (internal citation omitted)).

Here, Plaintiff contends that B.P. should be compared to "all APS students submitting transfers to and from APS high schools." (Doc. 88 at 18.) "But Plaintiff's definition of 'similarly situated' in a class-of-one case is too broad, as discussed below. Also, Plaintiff[] ha[s] not presented compelling evidence of a truly similarly situated comparator." *Highland Dev., Inc.*, 505 F. Supp. 2d at 1151 (citing *Jennings*, 383 F.3d at 1215 (noting that "the multiplicity of relevant (nondiscriminatory) variables requires [a class-of-one] plaintiff to provide compelling evidence of other similarly situated persons who were in fact treated differently") (internal citation omitted)).

"The Tenth Circuit has emphasized how narrowly the favored class must be defined." *Id.*

The *Jennings* Court shared this language from the District of Massachusetts:

> It might be suggested that all applicants should be considered "similarly situated" simply because they had all made requests for waivers of the dead-end street length regulation. But that is so broad a definition of "similarly situated" that it is not useful for equal protection analysis; it could be applied to any group of applicants where, looking back, one could see that there had been some who succeeded and some who failed. For example, high school students whose applications to a particular college were rejected could allege that they were being treated differently from the "similarly situated" fellow students whose applications were accepted. In the example, *one would want to know a good deal more about the merits of individual applicants before deciding who was similarly situated to whom.*

*Jennings*, 383 F. 3d at 1214 (quoting *Lakeside Builders, Inc. v. Planning Bd. of the Town of Franklin*, 2002 WL 31655250, at *3 (D. Mass. Mar. 21, 2002) (internal citations omitted)).

Similarly, here, when students request to transfer into a specific school, APS's transfer policy hinges on the classifications of the individual students. As Ms. Green testified, there are five student enrollment priority categories: the first priority goes to a student who lives in the attendance area; the second priority goes to a student who asks to transfer into a school that is ranked in need of improvement; the third priority goes to a student who has previously attended their requested transfer school; the fourth priority goes to a student who has an "enrollment preference" (enrollment preferences include, for example, a student who has a sibling attending the requested school, or a sibling pair requesting the same school together, or a student who is seeking a transfer due to a safety issue); the fifth priority simply goes to all other applicants. (Doc. 88-10 at 25:12–27:10.)

Thus, to compare herself to *all* students who seek transfers is simply too broad a classification. Beyond the limited information Plaintiff offered about B.P.'s brother and friend, Gabby, Plaintiff does not "supply *any* information regarding the allegedly similarly situated"

transfer-seeking students. *See Jennings*, 383 F.3d at 1215. What priority levels were the other students? Were there any other students with an IEP who requested a transfer? Were there other sibling pairs? Any students who requested transfers due to student safety? How many other students requested a transfer during that time period? "Without answers to questions such as these, neither this Court nor a jury could meaningfully compare [B.P.'s] treatment to that of other" students requesting transfers. *See Jennings*, 383 F.3d at 1215. "After all, as plaintiff, she bears the burden of proof on this issue after discovery." *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Celotex*, 477 U.S. at 322).

Even if Plaintiff narrowed the scope of her comparators to include only B.P.'s brother and Gabby, Plaintiff would still fail to satisfy the "similarly situated" element. "The Second Circuit has . . . noted that, '[i]n order to succeed on a "class of one" claim, the *level of similarity* between plaintiffs and the persons with whom they compare themselves *must be extremely high*.'" *Highland Dev., Inc.*, 505 F. Supp. 2d at 1251 (quoting *Neilson*, 409 F.3d at 104 (internal citation omitted)). "The *Neilson* court required the class-of-one plaintiff to show that 'the similarity in circumstances and difference in treatment are sufficient to *exclude the possibility that the defendant acted on the basis of a mistake*.'" *Id.* (quoting *Neilson*, 409 F.3d at 105 (internal citation omitted)). "This narrowly defined standard is consistent with . . . language in *Jennings*," where the Tenth Circuit stated that,

> unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It

would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review.

*Id.* at 1151–52 (quoting *Jennings*, 383 F.3d at 1210–11).

Plaintiff takes pains to argue that B.P.'s status as a student with an IEP in the special education program was not a material difference, because APS employees are required to apply the Enrollment Priority Process equally to all transfer requests. (Doc. 88 at 18.) The Court agrees that the computer program APS uses to sort students into enrollment priority categories would not have considered B.P.'s special education status. B.P.'s status as a C level special education student becomes material, however, once the computer program churns out the waiting list of students. Indeed, Ms. Green testified that an IEP would come into play before the transfer could be completed: once the transfer office receives a transfer request, the "office determines if there's space by looking at the site capacity of the requested school the student wants to transfer to. If that student is special ed, then they get passed over to special ed to determine whether there's program availability." (Doc. 88-10 at 22:1–23:3; 27:11–21.) Ms. Green also testified that B.P. "would have been on the waiting list as a C level student." (*Id.* at 62:2–3.) The transfer waiting list actually would have identified B.P.—and not her brother or Gabby—as a special education student. (*Id.* at 66:13–21.) Thus APS administrators were automatically notified that B.P.'s transfer request would require an additional hurdle that would be unnecessary for a general education student—the requested transfer school of a C level student would *also* need to have space in its special education program. This difference between B.P. and her brother, Gabby, or any other general education student requesting a transfer, is material and "relates to a governmental interest." *See Jicarilla Apache Nation*, 440 F.3d at 1213.

Plaintiff attempts to downplay this distinction by arguing that the principal at AHS accepted her transfer with full special education accommodations, accommodations that Plaintiff argues were minimal. (*See* Docs. 49 at 2; 88 at 18–19.) While Principal McCorkle ultimately agreed to accept B.P. with her accommodations, he initially asked her parents to consider pulling B.P. from the special education program, because AHS's special education program was full. (Doc. 88-1 ¶ 12; *see also* Doc. 88-5 at 2 (typed copy of Principal Garcia's handwritten notes stating that Principal McCorkle called Assistant Principal Dooley and "communicated that [B.P.'s] parents wanted to take her out of special-Ed [sic] because AHS could not accommodate her needs as a special Education student").) Further, that B.P.'s mother asked in January 2016 to release B.P. from her IEP also illustrates that B.P.'s IEP was somehow at play. (Doc. 88-1 ¶¶ 12–14.) The simple fact that the parties spend so much time arguing whether B.P. *could have transferred* to AHS with or without accommodations only serves to highlight that B.P.'s transfer request was unique.

B.P. was also materially different from her friend, Gabby, because there is no evidence that Gabby requested to transfer with a sibling, nor is there evidence to show what school Gabby requested to transfer to. (*See* Doc. 49-2.) Moreover, Gabby requested to transfer away from WMHS in April 2016—approximately six months after B.P. and her brother submitted their requests. (*Id.* ¶ 7.) This difference in time is material, because at the time B.P.'s mother requested a transfer, she was told that "[APS] was not approving any transfers until the holidays were over unless the school principal agreed that student safety was a concern." (Doc. 88-1 ¶ 8.) *See also Purze*, 286 F.3d at 455 (citation omitted) (finding that plaintiff was not prima facie identical to other developers in part because the other developers "submitted their plats during different time periods").

Plaintiff also argues that there is "a genuine dispute of material fact about whether AHS lacked site capacity to accept B.P.'s transfer." (Doc. 88 at 20.) Plaintiff makes this argument, however, with respect to the second element of her class-of-one equal protection claim, whether APS's conduct was objectively irrational and abusive. (*See id.* at 19–22.) For purposes of analyzing the "similarly situated" element of Plaintiff's claim, the Court need not decide the question of whether AHS's special education program was full. Regardless whether AHS actually had site capacity in its special education program, the undisputed fact remains that B.P. required special education services in October 2015, while her brother and Gabby did not. Thus, B.P. was not similarly situated to either her brother or Gabby, and it is unnecessary to decide whether APS's conduct was objectively irrational and abusive. Distinguishing between general and special education students was a legitimate interest, and given the differences between B.P., her brother, and Gabby, the Court "cannot agree with [Plaintiff's] argument that [Gabby, B.P.'s brother, or any other unnamed students requesting transfers] are sufficiently similarly situated to sustain a class-of-one claim." *Jicarilla Apache Nation*, 440 F. 3d at 1214.

Plaintiff has failed to satisfy her exacting burden to show that B.P. was similarly situated to a relevant comparator. It is simply not possible for Plaintiff to establish that B.P. "was treated differently from other persons . . . whose situations were identical in all material respects . . . ." *See Penner v. City of Topeka, Kan.*, 437 F. App'x 751, 754 (10th Cir. 2011) (quotation omitted). The Court will grant Defendants' Motion on this issue. Thus, the Court need not determine whether Defendants had a rational basis for their actions, nor whether the law was clearly established with respect to any Defendants sued in their individual capacities. Plaintiff's equal protection claim is dismissed.

**IV.     The Court will grant Plaintiff's Opposed Motion for Page Limit Extension.**

Finally, the Court turns to Plaintiff's Opposed Motion for Page Limit Extension, which she belatedly filed on November 1, 2017. (Doc. 93.) The rules of this Court allow for only 50 pages of exhibits. *See* D.N.M. LR-Civ. 10.5. Plaintiff contends that she "mistakenly exceeded" this limit and submitted 98 pages of exhibits to her Supplemental Response, together with an audio CD.[13] (*See* Doc. 97 at 2.) Defendants argue against allowing the excessive pages, but they also contend that Plaintiff's "additional factual contentions and/or citations to the record . . . [do] not create a dispute of material fact or change the legal analysis that applies to Plaintiff's claims." (Doc. 94 at 3.) The Court has examined the entirety of Plaintiff's exhibits and, as discussed in its above analysis, agrees. Further, Defendants have failed to identify any prejudice resulting from Plaintiff's submission of excessive pages. *See Carrasco v. N.M. Dep't of Workforce Sols.*, No. 10-0999 MCA/SMV, 2013 WL 12092509, at *7 (D.N.M. Mar. 19, 2013). Consequently, the Court has granted Plaintiff's Motion and considered Plaintiff's exhibits along with her argument.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Opposed Motion for Page Limit Extension (Doc. 93) is **GRANTED**; and

---

[13] The Court notes that at least 14 of the 98 pages are duplicates of pages submitted with Plaintiff's original response (*compare* Doc. 49-1 *with* Doc. 88-1; Doc. 49-5 *with* Doc. 88-20; Doc. 49-8 *with* Doc. 88-23), and at least 2 pages are statutory text, for which the Court needs no exhibit submitted (*see* Doc. 88-21). This leaves 82 pages of exhibits attached to Plaintiff's Supplemental Response for the Court to sift through.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiff's Equal Protection Claim for Failure to State a Claim and on the Basis of Qualified Immunity (Doc. 41) is **GRANTED** and Plaintiff's Equal Protection claim is dismissed with prejudice.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**